**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| BUNKER HILL TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VOLVO CAR CORPORATION, VOLVO CAR USA LLC, and POLESTAR PERFORMANCE AB,<br><br>Defendants. | CIVIL ACTION NO. 2:26-cv-741<br><br>**JURY TRIAL DEMANDED** |

**<u>PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT</u>**

Plaintiff Bunker Hill Technologies, LLC files this Complaint against Defendants Volvo Car Corporation, Volvo Car USA LLC, and Polestar Performance AB (collectively, "Defendants") for infringement of U.S. Patent No. 8,030,884 ("the '884 Patent"), U.S. Patent No. 8,487,582 ("the '582 Patent"), U.S. Patent No. 9,809,121 ("the '121 Patent"), U.S. Patent No. 9,914,365 ("the '365 Patent"), U.S. Patent No. 9,975,439 ("the '439 Patent"), and U.S. Patent No. 10,604,023 ("the '023 Patent") (collectively, the "Asserted Patents").

**<u>THE PARTIES</u>**

1. Plaintiff Bunker Hill Technologies, LLC ("BHT") is a Texas limited liability company located in Allen, Texas.

2. Defendant Volvo Car Corporation ("VCC") is a corporation organized and existing under the laws of Sweden with a principal place of business at VAK Building, Gunnar Engellaus väg 8, Göteborg, Sweden. On information and belief, VCC, directly or through its wholly owned subsidiaries, is responsible for research and development, manufacturing, sales, offers for sale,

marketing, importation, and distribution of automotive vehicles from Volvo-managed brands in the United States, including this District.

3. VCC conducts business in the State of Texas and in the Eastern District of Texas, directly or through intermediaries, including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others.

4. VCC is engaged in making, using, selling, offering for sale, and/or importing Volvo-branded vehicles having electric or hybrid-electric powertrain systems (included in the "Accused Products")[1] to and throughout the United States, including this District. VCC also induces its subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, and customers in the making, using, selling, offering for sale, and/or importing such products to and throughout the United States, including this District. To this end, VCC and its foreign and U.S.-based subsidiaries—which act together as part of VCC's global network of sales and manufacturing emissaries—have operated as agents of, and for, one another and have otherwise acted vicariously for VCC as elements of the same business group and/or enterprise. Indeed, they work in concert and in orchestrated fashion, subject to agreements that are far nearer than arm's length, in order to implement a distribution channel of infringing products within this District and the United States.

5. On information and belief, VCC imports and/or ships Volvo-branded Accused Products and/or component parts of Volvo-branded Accused Products and accused systems into the United States.

[1] The Accused Products include each Volvo-branded and Polestar-branded vehicle having electric or hybrid-electric powertrain systems. Specific models referenced herein are examples of such vehicles.

Importer

- Importer Name: Volvo Car Corporation
- Trade Name: VOLVO
- Address: 405 31 Göteborg, Sweden
- URL: volvocars.com [https://www.volvocars.com]

Source: https://www.volvocars.com/us/support/car/ex90/24w36/article/

**3056** Shipments between
**VOLVO CAR CORPORATION**
and **VOLVO CAR USA LLC**

**Shipper**

| | |
|---|---|
| Shipper Name | VOLVO CAR CORPORATION |
| Address Line 1 | ACCOUNTIG DEPARTMENT |
| Address Line 2 | GOETEBORG, O 40531 SE |

**Consignee**

| | |
|---|---|
| Consignee Name | VOLVO CAR USA LLC |
| Address Line 1 | 300 HOWMEDICA WAY |
| Address Line 2 | RUTHERFORD, NJ 07070-2586 US |

Source: https://www.importinfo.com/volvo-car-corporation

6. Volvo-branded Accused Products (e.g., 2025 Volvo EX90) bear a U.S. vehicle certification label stating "MFD [(manufactured)] BY VOLVO CAR CORPORATION" and that the vehicles conform to applicable U.S. federal motor vehicle safety standards. *See, e.g.,* https://www.volvocars.com/us/support/car/ex90/24w36/article/47d2c97fd33effd3c0a8cc3718c999b7-cf578f17ce837790c0a8b04a1abf9aaa-8664b2fa77a7e089c0a8296870d1a409/47d2c97fd33effd3c0a8cc3718c999b7-350655bc554de2a7c0a8b097561c9a50-8664b2fa77a7e089c0a8296870d1a409/0ed816eed33d98cac0a8cc377bc12bc7-

395c564dc07493bbc0a8b0972ad70fe3-8664b2fa77a7e089c0a8296870d1a409/. This label demonstrates that VCC manufactured the Volvo-branded Accused Products for sale and use in the United States and participated in, directed, or caused its importation and placement into U.S. commerce.

7. VCC maintains a substantial corporate presence in the United States, this State, and this District via at least its U.S.-based subsidiaries.

8. Alone and through at least the activities of its U.S.-based subsidiaries, VCC conducts business in the United States and this District, including importing, making, distributing, and selling Volvo-branded Accused Products that infringe the Asserted Patents. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state*….")*; *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

9. Through importation, manufacture, offers to sell, sales, distributions, and related agreements to transfer ownership of VCC's products with subsidiaries, distributors, and customers operating in and maintaining significant business presences in the United States, VCC does extensive business in the United States, this State, and this District.

10. VCC operates (and has operated) in agency with its respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, to provide a distribution channel of infringing products within this District and the U.S. nationally. VCC and/or its respective agents and foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners,

suppliers, and customers, purposefully direct (and has directed) the Volvo-branded Accused Products into established distribution channels within this District and the U.S. nationally.

11. On information and belief, VCC, including its respective U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. VCC and its U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and/or customers, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, shipping, distributing, offering to sell, and selling the Volvo-branded Accused Products that incorporate devices, systems, and processes that infringed the Asserted Patents in Texas and this District.

12. VCC and its subsidiaries operate through coordinated management, common ownership, common Volvo-branded advertising and customer-support platforms, integrated U.S. facilities, common distribution chains and dealer/financing platforms, and overlapping Volvo-branded infringing product lines and products involving related technologies. On information and belief, VCC operates (and has operated) as a single business entity and/or in concert with its affiliates, distributors, subsidiaries, suppliers, retail partners, customers, and/or agents to manufacture, sell, offer to sell, import, market, advertise, and/or otherwise promote the Volvo-branded Accused Products in the United States, including in the State of Texas generally and this District in particular.

13. On information and belief, VCC and its subsidiaries operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein. On information and belief, VCC and its subsidiaries operate as an integrated Volvo business enterprise with respect to the Volvo-branded Accused Products, and VCC is liable for the infringing acts alleged herein directly, vicariously, and/or through agency and alter-ego principles.

14. Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of VCC's Volvo-branded Accused Products by and/or to affiliates, distributors, subsidiaries, suppliers, business partners, retail partners, customers, and/or agents, VCC is operating in (and has operated in) and maintaining (and maintained) a significant business presence in the U.S. and/or through its U.S. subsidiaries or agents, VCC has done (and does) business in the U.S., the state of Texas, and in the Eastern District of Texas.

15. Defendant Volvo Car USA LLC ("VCUSA") is a Delaware company with a regular and established place of business at 3434 McPherson Drive, Northlake, Texas 76226. On information and belief, VCUSA is an indirect wholly owned subsidiary of VCC. On information and belief, VCC established VCUSA for the purpose of strategic brand and customer development in the United States and to provide services, distribution, and sales to VCC's existing U.S. customers. *See* https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (describing VCUSA as a subsidiary of VCC "providing sales, marketing, parts, service, technology, and training support to Volvo automobile retailers in the United States since the 1950s."). VCUSA is engaged in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District. VCUSA may be served with process through its registered agent, C T Corporation System, 1999 Bryan St, Ste 900, Dallas, TX, 75201.

16. VCUSA maintains a substantial and established 48,000-square-foot facility in Northlake, Texas, known as its Dallas Distribution Center. Among other operations, VCUSA maintains a Battery Center at the Dallas Distribution Center that performs technical work directly relating to the electric vehicle systems accused in this action. *See, e.g.*, https://jobs.volvocars.com/job/Northlake-Battery-Center-Technician-Lead-TX-76247/1402090233/ (repair, remanufacture, assembly, and testing of high-voltage battery packs, modules, and components performed at the Battery Center). Accordingly, VCUSA maintains within this District personnel, facilities, and technical operations directly concerning the electric vehicle technologies incorporated into Accused Products.




Source: https://maps.app.goo.gl/teBkoXxkKVZApmLb7

17. On information and belief, VCUSA is, and has been, an agent of VCC and/or controlled by VCC. *See, e.g.,* https://investors.volvocars.com/en/results-and-reports/results-centre?page=/en/reports/volvo-car-ab-%28publ-%29-publishes-annual-and-sustainability-report-2025-2432113 (demonstrating VCC's global financial information includes the United States market (VCUSA)). For example, VCC "owns and operates, through its subsidiary Volvo Car USA LLC [] a plant for manufacturing of cars in Charleston in the United States of America." https://www.sec.gov/Archives/edgar/data/1884082/000188408225000012/ex_4155xps22-052p519manu.htm. As another example, VCUSA issues recalls "on behalf of the Volvo Car Corporation" to which recall-related decisions are "confirmed by Volvo Car Corporation." *See, e.g.,* https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V104-1267.pdf; https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V071-1210.PDF. On information and belief,

VCUSA provides (and has provided) sales, distribution, testing, research, and/or development support in the United States for its ultimate parent VCC, which indirectly wholly owns VCUSA. At the direction and control of VCC, its subsidiaries, including VCUSA, have made, used, sold, offered for sale, and/or imported and continue to make, use, sell, offer for sale, and/or import Accused Products in the United States and this District. VCC and VCUSA are referred to herein collectively as "Volvo."

18. Defendant Polestar Performance AB ("Polestar") is a corporation organized and existing under the laws of Sweden with a principal place of business at Assar Gabrielssons Väg 9, 405 31 Gothenburg, Sweden. On information and belief, Polestar is minority owned (roughly 20 percent) by VCC. *See* https://investors.polestar.com/news-releases/news-release-details/polestar-announces-updates-its-capital-structure-and-intention. On information and belief, Polestar, directly or through its wholly owned subsidiaries, is responsible for research and development, manufacturing, sales, offers for sale, marketing, importation, and distribution of Polestar-branded Accused Products in the United States, including this State.

19. Polestar conducts business in the State of Texas, directly or through intermediaries, including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others.

20. Polestar is engaged in making, using, selling, offering for sale, and/or importing Polestar-branded vehicles having electric or hybrid-electric powertrain systems (included in the "Accused Products") to and throughout the United States, including this State. *See, e.g.*, https://www.polestar.com/us/news/polestar-3-manufactured-in-usa/ (Polestar vehicles assembled in the United States). Polestar also induces its subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, and customers in the making, using, selling, offering for sale, and/or

importing such products to and throughout the United States, including this District. To this end, Polestar and its foreign and U.S.-based subsidiaries—which act together as part of Polestar's global network of sales and manufacturing emissaries—have operated as agents of, and for, one another and have otherwise acted vicariously for Polestar as elements of the same business group and/or enterprise. Indeed, they work in concert and in orchestrated fashion, subject to agreements that are far nearer than arm's length, in order to implement a distribution channel of infringing products within this District and the United States. *See* https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm, pp. 3-4 (Polestar's agreement with VCUSA provides for Polestar to sell vehicles to VCUSA for importation into the United States, cause its U.S.-based subsidiary to purchase the imported vehicles and sell and distribute them to U.S. customers, and ensure compliance with applicable U.S. regulatory requirements).

21. Polestar maintains a substantial corporate presence in the United States and this State via at least its U.S.-based subsidiaries.

22. Alone and through at least the activities of its U.S.-based subsidiaries and affiliates, Polestar conducts business in the United States and this State, including importing, making, distributing, and selling Polestar-branded Accused Products that infringe the Asserted Patents. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state *....*"*); see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

23. Through importation, manufacture, offers to sell, sales, distributions, and related agreements to transfer ownership of Polestar's products with subsidiaries, distributors, and customers operating in and maintaining significant business presences in the United States, Polestar does extensive business in the United States and this State.

24. Polestar operates (and has operated) in agency with its respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, to provide a distribution channel of infringing products within this State and the U.S. nationally. Polestar and/or its respective agents and foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and has directed) the Polestar-branded Accused Products into established distribution channels within this State and the U.S. nationally.

25. On information and belief, Polestar, including its respective U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. Polestar and its U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and/or customers, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, shipping, distributing, offering to sell, and selling the Polestar-branded Accused Products that incorporate devices, systems, and processes that infringed the Asserted Patents in Texas.

26. Polestar and its subsidiaries and affiliates operate through coordinated management, common ownership, common Polestar-branded advertising and customer-support platforms, common distribution chains and dealer/financing platforms, and overlapping Polestar-

branded infringing product lines and products involving related technologies. On information and belief, Polestar operates (and has operated) in concert with its affiliates, distributors, subsidiaries, suppliers, retail partners, customers, and/or agents to manufacture, sell, offer to sell, import, market, advertise, and/or otherwise promote the Polestar-branded Accused Products in the United States, including in the State of Texas generally and this District in particular.

27. On information and belief, Polestar and its subsidiaries operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein. On information and belief, Polestar and its subsidiaries operate as an integrated Polestar business enterprise with respect to the Polestar-branded Accused Products, and Polestar is liable for the infringing acts alleged herein directly, vicariously, and/or through agency and alter-ego principles.

28. Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Polestar's Polestar-branded Accused Products by and/or to affiliates, distributors, subsidiaries, suppliers, business partners, retail partners, customers, and/or agents, Polestar is operating in (and has operated in) and maintaining (and maintained) a significant business presence in the U.S. and/or through its U.S. subsidiaries or agents, Polestar has done (and does) business in the U.S. and the state of Texas.

29. On information and belief, Volvo and Polestar incorporate the same or substantially the same electric vehicle systems, components, architectures, and functionality in the Accused Products. Volvo and Polestar have jointly developed, shared, and/or utilized common vehicle platforms, hardware, software, and electric vehicle technologies, including Volvo-developed vehicle architectures and technology used in both Volvo and Polestar vehicles. *See* https://www.sec.gov/Archives/edgar/data/1884082/000188408224000008/psny-20231231.htm, pp. 16-17 ("Polestar benefits from the technological, engineering and manufacturing capabilities

of Volvo Cars … Polestar's agreements with Volvo Cars cover research and development services, intellectual property licenses, purchasing, manufacturing engineering and logistics engineering and manufacturing … [and] design services ….”); https://www.volvocars.com/us/media/press-releases/ADB2323DCE98F2BA/ (Volvo securing a battery supplier for “Volvo and Polestar models”); https://thedriven.io/vehicle/volvo-volvo-ex90/ (Volvo EX90 and Polestar 3 “utilising the same 111 kWh battery pack and dual-motor drivetrain”). For example, the Volvo EX90 and Polestar 3 utilize Volvo's SPA2 vehicle architecture and related electric vehicle technology, while other Volvo and Polestar vehicles similarly share common platforms and systems. *See* https://www.polestar.com/us/news/polestar-3-nvidia-core-computer/ (Polestar 3 “underpinned by the Superset tech stack and SPA2 platform developed by our partner Volvo Cars.”); *see also* https://investors.volvocars.com/~/media/Files/V/Volvo-Cars-IR/results-center/2018/volvoAR2018report.pdf (Volvo XC40 and Polestar 2 are “based on the same technology shared between Volvo Cars and Polestar.”). Accordingly, on information and belief, the Accused Products incorporate the same or substantially the same electric vehicle charging, high-voltage distribution, battery management, and related systems relevant to the Asserted Patents.

30. This suit is commenced against all Defendants pursuant to 35 U.S.C. § 299 in a single action because, *inter alia*, as described above, the Volvo and Polestar Defendant entities share portions of research and development, engineering, logistics, purchasing, and manufacturing efforts to incorporate the same or substantially the same electric vehicle systems in the Accused Products. Accordingly, questions of fact common to all Defendants will arise in this action.

## **JURISDICTION AND VENUE**

31. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

32. This Court has specific and general personal jurisdiction over VCC consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, VCC has engaged in continuous, systematic, and substantial business in Texas and has committed and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Volvo-branded Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, VCC has purposefully and voluntarily placed, and is continuing to place, one or more Volvo-branded Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into the United States, this State, and this District.

33. In addition, VCC has facilities and employees in the United States. *See, e.g.*, https://investors.volvocars.com/en/results-and-reports/results-centre?page=/en/reports/volvo-car-ab-%28publ-%29-publishes-annual-and-sustainability-report-2025-2432113 (VCC has "~2,800 Americas employees");

https://www.sec.gov/Archives/edgar/data/1884082/000188408225000012/ex_4155xps22-052p519manu.htm (VCC "owns and operates, through its subsidiary Volvo Car USA LLC [] a plant for manufacturing of cars in Charleston in the United States of America."); https://jobs.volvocars.com/search/?locationsearch=united+states (VCC's website listing job postings in the United States).

34. Upon information and belief, VCC compensates its U.S.-based subsidiaries and/or agents for their sales and/or support services in the United States. As such, VCC has a direct financial interest in its U.S.-based subsidiaries and/or agents, and/or partners, distributors, or customers, and vice versa.

35. In addition, VCC has derived substantial revenues from its infringing acts occurring within this State and this District. VCC has substantial business in this State and this District, including (i) at least part of its infringing activities alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents vicariously through and/or in concert with its agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers.

36. On information and belief, VCC controls (or has controlled) or otherwise directs (or has directed) and authorizes (or has authorized) all activities of its U.S.-based (or foreign-based with the knowledge that the Volvo-branded Accused Products are directed to the United States and this District) agents and/or sales and/or distribution subsidiaries. Such directed and authorized activities include the U.S.-based (and/or foreign-based) subsidiaries' and/or agents having used, offered for sale, sold, and/or imported the Volvo-branded Accused Products, their components, processes, and/or products containing the same that incorporated the fundamental technologies and

claims of the Asserted Patents. VCC's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries and/or agents were authorized to import, distribute, sell, or offer for sale the Volvo-branded Accused Products on behalf of VCC. For example, VCC researched, designed, developed, and manufactured the Volvo-branded Accused Products, and then directed its U.S.-based (and/or foreign-based) sales subsidiaries, distributors, business partners, agents, and/or others to import, distribute, offer for sale, and sell the Volvo-branded Accused Products in the United States. *See, e.g.*, *Am. Patents LLC v. D-Link Corp.*, Civil Action No. 4:19-cv-764, 2020 U.S. Dist. LEXIS 123158, at 15* (E.D. Tex. July 14, 2020) ("It is enough, for a prima facie case, that [defendant] appears to have had a role in orchestrating—through its wholly owned subsidiary—the accused products' *placement* in the stream of commerce.") (emphasis in original); *see also United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Thus, VCC conducted infringing activities, and VCC's U.S.-based (and foreign-based) sales subsidiaries and/or distributors and/or agents and/or business partners conducted infringing activities on behalf of VCC.

37. On information and belief, VCC's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries' and/or agents' presence (including in the past) in the United States gave VCC substantially the same business advantages that it would have enjoyed if VCC conducted its business through its own offices or paid agents. VCC's U.S.-based (and/or foreign-based) sales subsidiaries and/or distributors and/or agents were authorized to import, distribute, sell, and offer for sale VCC's products, including the Volvo-branded Accused Products, as well as their components and processes related to the same, on behalf of VCC. For example, VCC's U.S.-based

(and/or foreign-based) sales subsidiaries and/or agents operated within VCC's global network and supply chain of sales. In the U.S., including within the Eastern District of Texas, the Volvo-branded Accused Products, as well as their components and processes related to the same, were imported, distributed, offered for sale, and/or sold.

38. Via VCC's alter egos, agents, business partners, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers that maintained a business presence, operating in, and/or residing in the U.S., VCC's products, including products and processes accused of infringing the Asserted Patents, are or have been widely distributed and sold in Texas including within this District. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp*., No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently pleaded that purchases of infringing products outside of the United States for importation into and sales to customers in the U.S. may constitute a sale or an offer to sell under § 271(a)).

39. On information and belief, VCC has placed infringing products and/or products that practiced infringing processes into the stream of commerce via established distribution channels comprising at least its subsidiaries, business partners, affiliates, distributors, and/or agents or customers, with the knowledge and/or intent that those products were imported, used, offered for sale, and sold in the United States and Texas, including in this District. As a result, VCC has, vicariously through and/or in concert with alter egos, agents, intermediaries, distributors, affiliates, importers, customers, subsidiaries, and/or consumers, placed the Volvo-branded Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent

that those products were sold and continue to be sold in the United States and Texas, including in this District.

40. The minimum contacts test is satisfied because VCC delivers its products (e.g., Volvo-branded vehicles) into the stream of commerce with the expectation that they will be purchased by consumers in Texas. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 100 S. Ct. 559 (1980)); *see also Universal Connectivity Techs. Inc. v. Lenovo Grp. Ltd.*, No. 2:23-CV-00449-JRG, 2024 U.S. Dist. LEXIS 189038, at *8-9 (E.D. Tex. Oct. 16, 2024). For example, and on information and belief (and as provided for herein), VCC imports, and/or has imported and/or shipped infringing Volvo-branded Accused Products into the United States through and with its supply chain partners and/or agents, including, but not limited to, VCC subsidiaries and/or affiliates and/or agents, such as VCUSA. VCC supplies its Volvo-branded Accused Products to its customers, subsidiaries, affiliates, agents, and/or distributors knowing that its Volvo-branded Accused Products are offered for sale, sold, imported, and/or used by VCC, its customers, subsidiaries, affiliates, and/or agents in the United States and this District. The Volvo-branded Accused Products were (and are) directed to this District and were (and are) available for purchase in this District via dealerships. The lengthy and complex distribution chain does not insulate VCC from suit in Texas.

41. VCC intentionally placed its Volvo-branded vehicles in a distribution chain flowing from Europe to the United States, Texas, and this District. For example, VCC intentionally places its Volvo-branded vehicles in a distribution or supply chain knowing that such Volvo-branded vehicles (e.g., 2025 Volvo EX90) ultimately arrive in the United States market and this District through, at least, its direct and indirect customers such as dealerships. VCC, through its sales of Volvo-branded vehicles downstream knew (or should have reasonably known) the likely

destination of the products, where VCC's conduct and connections with Texas and this District were such that VCC should have reasonably anticipated being brought to court in this District. Indeed, vehicles manufactured by VCC include a statement that the vehicles conform to applicable federal motor vehicle safety standards indicating compliance with the laws and regulations of the United States further evidencing that VCC knew or should have known that its products were destined for the United States and this District.

42. Moreover, VCC is the assignee of a substantial number of United States patents and patent applications, including use of U.S. patent counsel to procure such patents in their name. Thus, VCC sought out the United States market, evidenced by seeking patent protection in the United States.

43. VCC, including through its U.S.-based subsidiaries, has and had commercial relationships with a significant number of dealerships, and VCC accesses the Texas vehicle market vis-à-vis these relationships. Given VCC's relationship with such dealerships, jurisdiction in this Court is fair and reasonable. VCC also accesses the U.S. and Texas vehicle markets through Volvo Car Financial Services U.S., LLC ("VCFS"), VCC's captive finance entity. On information and belief, VCFS is wholly owned by VCC and provides financing services to authorized VCC dealerships and customers in the United States, including from its Dallas, Texas operations. *See* https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/. Through VCFS, VCUSA, and authorized Volvo dealerships, VCC facilitates the offer for sale, sale, lease, financing, distribution, and use of Volvo-branded Accused Products in the United States and Texas.

44. Also by way of example, and on information and belief, VCC has (and has had) U.S.-based (and/or foreign-based) employees that work in connection with the Volvo-branded Accused Products, including, but not limited to, employees affiliated with VCUSA.

45. In addition, VCC, directly or through its wholly owned subsidiaries, has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling Volvo-branded Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Volvo-branded Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage use of infringing functionality with VCC's knowledge thereof.

46. VCC has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. VCC also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State and District.

47. In the alternative, the Court has personal jurisdiction over VCC under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal law, VCC is not subject to the jurisdiction of the courts of general jurisdiction of any state and exercising jurisdiction over VCC is consistent with the U.S. Constitution. Exercising

jurisdiction comports with due process given VCC's purposeful availment from the sales of Volvo-branded Accused Products in the Unites States, this State, and this District.

48. Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, VCC is a foreign corporation and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

49. This Court has specific and general personal jurisdiction over VCUSA consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, VCUSA: (i) has engaged in continuous, systematic, and substantial business in Texas; (ii) maintains a place of business in Texas and in this District; (iii) is registered to do business in Texas; and (iv) has committed, and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, VCUSA has purposefully and voluntarily placed, and continues to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to, and purchased by, consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into and/or sold within the United States, this State, and this District.

50. Venue is proper as to VCUSA in this District under 28 U.S.C. §§ 1391 and 1400(b) because, among other things: (i) VCUSA is subject to personal jurisdiction in this District; (ii) VCUSA has committed acts of patent infringement in this District; and (iii) VCUSA has at least one regular and established place of business in this District, including at 3434 McPherson Drive, Northlake, Texas 76226.

51. This Court has specific and general personal jurisdiction over Polestar consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Polestar has engaged in continuous, systematic, and substantial business in Texas and has committed and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Polestar-branded Accused Products (as more particularly identified and described throughout this Complaint) in this State and/or inducing others to commit acts of patent infringement in this State and District. Indeed, Polestar has purposefully and voluntarily placed, and is continuing to place, one or more Polestar-branded Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into the United States and this State. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm (Polestar actively orchestrating importation and sales of Polestar-branded Accused Products in the United States).

52. Upon information and belief, Polestar compensates its U.S.-based subsidiaries and/or agents for their sales and/or support services in the United States. As such, Polestar has a direct financial interest in its U.S.-based subsidiaries and/or agents, and/or partners, distributors, or customers, and vice versa.

53. In addition, Polestar has derived substantial revenues from its infringing acts occurring within this State. Polestar has substantial business in this State, including (i) at least part of its infringing activities alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents vicariously through and/or in concert with its agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers.

54. On information and belief, Polestar controls (or has controlled) or otherwise directs (or has directed) and authorizes (or has authorized) all activities of its U.S.-based (or foreign-based with the knowledge that the Polestar-branded Accused Products are directed to the United States and this State) agents and/or sales and/or distribution subsidiaries. Such directed and authorized activities include the U.S.-based (and/or foreign-based) subsidiaries' and/or agents having used, offered for sale, sold, and/or imported the Polestar-branded Accused Products, their components, processes, and/or products containing the same that incorporated the fundamental technologies and claims of the Asserted Patents. Polestar's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries and/or agents were authorized to import, distribute, sell, or offer for sale the Polestar-branded Accused Products on behalf of Polestar. For example, Polestar researched, designed, developed, and manufactured the Polestar-branded Accused Products, and then directed its U.S.-based (and/or foreign-based) sales subsidiaries, distributors, business partners, agents,

and/or others to import, distribute, offer for sale, and sell the Polestar-branded Accused Products in the United States. *See, e.g.*, *Am. Patents LLC v. D-Link Corp.*, Civil Action No. 4:19-cv-764, 2020 U.S. Dist. LEXIS 123158, at 15* (E.D. Tex. July 14, 2020) ("It is enough, for a prima facie case, that [defendant] appears to have had a role in orchestrating—through its wholly owned subsidiary—the accused products' *placement* in the stream of commerce.") (emphasis in original); *see also United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Thus, Polestar conducted infringing activities, and Polestar's U.S.-based (and foreign-based) sales subsidiaries and/or distributors and/or agents and/or business partners conducted infringing activities on behalf of Polestar.

55. On information and belief, Polestar's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries' and/or agents' presence (including in the past) in the United States gave Polestar substantially the same business advantages that it would have enjoyed if Polestar conducted its business through its own offices or paid agents. Polestar's U.S.-based (and/or foreign-based) sales subsidiaries and/or distributors and/or agents were authorized to import, distribute, sell, and offer for sale Polestar's products, including the Polestar-branded Accused Products, as well as their components and processes related to the same, on behalf of Polestar. For example, Polestar's U.S.-based (and/or foreign-based) sales subsidiaries and/or agents operated within Polestar's global network and supply chain of sales. In the U.S., including within Texas, the Polestar-branded Accused Products, as well as their components and processes related to the same, were imported, distributed, offered for sale, and/or sold.

56. Via Polestar's alter egos, agents, business partners, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers that maintained a business presence, operating in, and/or residing in the U.S., Polestar's products, including products and processes accused of infringing the Asserted Patents, are or have been widely distributed and sold in Texas. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently pleaded that purchases of infringing products outside of the United States for importation into and sales to customers in the U.S. may constitute a sale or an offer to sell under § 271(a)).

57. On information and belief, Polestar has placed infringing products and/or products that practiced infringing processes into the stream of commerce via established distribution channels comprising at least its subsidiaries, business partners, affiliates, distributors, and/or agents or customers, with the knowledge and/or intent that those products were imported, used, offered for sale, and sold in the United States and Texas, including in this District. As a result, Polestar has, vicariously through and/or in concert with alter egos, agents, intermediaries, distributors, affiliates, importers, customers, subsidiaries, and/or consumers, placed the Polestar-branded Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas.

58. The minimum contacts test is satisfied because Polestar delivers its products (e.g., Polestar-branded vehicles) into the stream of commerce with the expectation that they will be purchased by consumers in Texas. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558,

1566 (Fed. Cir. 1994) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 100 S. Ct. 559 (1980)); *see also Universal Connectivity Techs. Inc. v. Lenovo Grp. Ltd.*, No. 2:23-CV-00449-JRG, 2024 U.S. Dist. LEXIS 189038, at *8-9 (E.D. Tex. Oct. 16, 2024). For example, and on information and belief (and as provided for herein), Polestar imports, and/or has imported and/or shipped infringing Polestar-branded Accused Products into the United States through and with its supply chain partners and/or agents, including, but not limited to, Polestar subsidiaries and/or affiliates and/or agents. Polestar supplies its Polestar-branded Accused Products to its customers, subsidiaries, affiliates, agents, and/or distributors knowing that its Polestar-branded Accused Products are offered for sale, sold, imported, and/or used by Polestar, its customers, subsidiaries, affiliates, and/or agents in the United States and this District. The Polestar-branded Accused Products were (and are) directed to this State and were (and are) available for purchase in this State via dealerships. The lengthy and complex distribution chain does not insulate Polestar from suit in Texas.

59. Polestar intentionally placed its Polestar-branded vehicles in a distribution chain flowing from Europe to the United States and Texas. For example, Polestar intentionally places its Polestar-branded vehicles in a distribution or supply chain knowing that such Polestar-branded vehicles (e.g., 2025 Polestar 3) ultimately arrive in the United States market and this State through, at least, its direct and indirect customers such as dealerships. Polestar, through its sales of Polestar-branded vehicles downstream knew (or should have reasonably known) the likely destination of the products, where Polestar's conduct and connections with Texas were such that Polestar should have reasonably anticipated being brought to court in this District. Indeed, vehicles manufactured by Polestar include a statement that the vehicles conform to applicable federal motor vehicle safety standards indicating compliance with the laws and regulations of the United States further

evidencing that Polestar knew or should have known that its products were destined for the United States and this State.

60. Polestar, including through its U.S.-based subsidiaries and affiliates, has and had commercial relationships with dealerships, and Polestar accesses the Texas vehicle market vis-à-vis these relationships. Given Polestar's relationship with such dealerships, jurisdiction in this Court is fair and reasonable. Polestar also accesses the U.S. and Texas vehicle markets through VCFS d/b/a Polestar Financial Services, the captive finance entity that provides Polstar with financing and account services. On information and belief, VCFS provides financing services to authorized Polestar dealerships and customers in the United States, including from its Dallas, Texas operations. *See* https://www.polestarfinancialservices.com/about/company-overview. Through VCFS and authorized Polestar dealerships, Polestar facilitates the offer for sale, sale, lease, financing, distribution, and use of Polestar-branded Accused Products in the United States and Texas.

61. In addition, Polestar, directly or through its wholly owned subsidiaries, has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling Polestar-branded Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Polestar-branded Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage use of infringing functionality with Polestar's knowledge thereof.

62. Polestar has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Polestar also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State.

63. In the alternative, the Court has personal jurisdiction over Polestar under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal law, Polestar is not subject to the jurisdiction of the courts of general jurisdiction of any state and exercising jurisdiction over Polestar is consistent with the U.S. Constitution. Exercising jurisdiction comports with due process given Polestar's purposeful availment from the sales of Polestar-branded Accused Products in the Unites States and this State.

64. Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, Polestar is a foreign corporation and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

## THE ASSERTED PATENTS AND TECHNOLOGY

65. BHT is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Indeed, BHT owns all substantial rights in the Asserted Patents, including the right to exclude others and to recover damages for all past, present, and future infringements.

66. The '884 Patent is entitled, "Apparatus for transferring energy using onboard power electronics and method of manufacturing same." The '884 Patent lawfully issued on October 4, 2011 and stems from U.S. Patent Application No. 12/550,504, which was filed on August 31, 2009.

67. The ’582 Patent is entitled, “Apparatus for transferring energy using onboard power electronics and method of manufacturing same.” The ’582 Patent lawfully issued on July 16, 2013 and stems from U.S. Patent Application No. 13/099,053, which was filed on May 2, 2011.

68. The ’121 Patent is entitled, “Apparatus for energy transfer using converter and method of manufacturing same.” The ’121 Patent lawfully issued on November 7, 2017 and stems from U.S. Patent Application No. 15/343,493, which was filed on November 4, 2016.

69. The ’365 Patent is entitled, “Apparatus and method for rapid charging using shared power electronics.” The ’365 Patent lawfully issued on March 13, 2018 and stems from U.S. Patent Application No. 15/265,404, which was filed on September 14, 2016.

70. The ’439 Patent is entitled, “Apparatus for energy transfer using converter and method of manufacturing same.” The ’439 Patent lawfully issued on May 22, 2018 and stems from U.S. Patent Application No. 15/697,948, which was filed on September 7, 2017.

71. The ’023 Patent is entitled, “Apparatus for energy transfer using converter and method of manufacturing same.” The ’023 Patent lawfully issued on March 31, 2020 and stems from U.S. Patent Application No. 15/945,168, which was filed on April 4, 2018.

72. The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

## DEFENDANT’S PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENT

73. Prior to filing this Complaint, Volvo was put on notice of its infringements of the Asserted Patents by way of communication with BHT’s licensing agent, including a letter addressed to Helen Hu (General Counsel, Volvo) and an email addressed to Milan Patel (IP Director, Volvo), regarding a potential license to BHT assets as early as October 14, 2025.

74. BHT's licensing agent sent a letter on April 7, 2026 to Volvo personnel, including Helen Hu (General Counsel), that included claim charts for the Asserted Patents that evidenced and demonstrated Volvo's infringement and identified specific infringing Volvo products.

75. On April 9, 2026, BHT's licensing agent further sent via email to Volvo personnel, including Helen Hu and Robert Sullivan, that included the April 7, 2026 letter and referenced the claim charts attached thereto.

76. Volvo responded to BHT's letter(s) on May 4, 2026 requesting claim charts. That same day, BHT sent via email to Volvo the requested claim charts as attachments and provided access to a data room containing the claim charts.

77. BHT and Volvo participated in ongoing discussions regarding a potential license, including having a telephonic conference that took place on July 9, 2026.

78. Prior to filing this Complaint, Polestar was put on notice of its infringements of the Asserted Patents by way of a letter sent by BHT's licensing agent addressed to Polestar personnel, Anna Rudensjö (Chief Legal Officer), identifying the Asserted Patents as being infringed by specific Polestar vehicles.

79. The Accused Products addressed in the Counts below include, but are not limited to, products identified in BHT's communications to Defendants. Defendants' past and continuing sales of the Accused Products (i) willfully infringe the Asserted Patents, and (ii) impermissibly usurp the significant benefits of BHT's patented technologies without fair compensation.

80. To the extent necessary, BHT has complied with the requirements of 35 U.S.C. § 287, such that BHT may recover pre-suit damages.

## COUNT I

(INFRINGEMENT OF U.S. PATENT NO. 8,030,884)

81. BHT incorporates the preceding paragraphs herein by reference.

82. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

83. BHT is the owner of all substantial rights, title, and interest in and to the ’884 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

84. The ’884 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on October 4, 2011, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

85. Defendants directly infringe one or more claims of the ’884 Patent in this District and elsewhere in Texas and the United States.

86. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 20 of the ’884 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the ’884 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems (collectively, “the ’884 Accused Products”).

87. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the ’884 Patent. *See, e.g., Lake Cherokee Hard Drive Techs.,*

*L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019). Furthermore, Defendants directly infringed the '884 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '884 Patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries' infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

88. Defendants offer to sell Accused Products in the United States via at least Defendants' websites. Defendants' websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/ and https://www.polestar.com/us/. These platforms are part of Defendants' integrated U.S. sales channel for Defendants' benefit and under Defendants' direction or control.

89. By way of illustration only, Defendants' '884 Accused Products comprise each and every element of claim 20 of the '884 Patent. The '884 Accused Products comprise "[a] system comprising: a charge bus configured to receive charging energy from a voltage source." For example, the '884 Accused Products are vehicles that include a wire harness (i.e., a charge bus) configured to receive energy from a charger (i.e., a voltage source) via a charging port.

**2025 Volvo EX90**



Source: https://www.caranddriver.com/volvo/ex90-2025



Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/

**Diagram 7: Wire Harness**




Source: https://volvo.oempartsonline.com/v-2025-volvo-ex90--plus--electric/electrical--battery?assembly=7




Source: https://ieeexplore.ieee.org/document/10215092

90. The ’884 Accused Products comprise a system comprising “an energy storage device configured to output a DC voltage and coupled to the charge bus.” For example, the ’884 Accused Products include a high voltage battery (i.e., an energy storage device) configured to output a DC voltage and is coupled to the wire harness (i.e., charge bus).

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

**Battery**

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/



PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

Drive Motor Battery Pack - Volvo (36011833)

We sell only 100% Genuine Volvo Replacement Parts

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36011833

Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833




Source: https://ieeexplore.ieee.org/document/10215092

91. The ’884 Accused Products comprise a system comprising “a first bi-directional voltage modification assembly coupled to the charge bus.” For example, the ’884 Accused Products include a bi-directional converter (i.e., a first bi-directional voltage modification assembly) coupled to the high voltage cables (i.e., charge bus).



## Hybrid Voltage Converter - Volvo (36010867)

2025-2026 Volvo EX90 - 36010867

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36010867 |

| | |
|---|---|
| **Brand:** | |
| **SKU:** | 36010867 |
| **Other Names:** | Voltage Reg, Voltage Converter, |
| **Description:** | Inverter & battery charger. |

Source: https://volvo.oempartsonline.com/oem-parts/volvo-hybrid-voltage-converter-36010867

## Hybrid Voltage Converter

Part Number: **36010867**

Converter and Charger. (hlcm).
(Exchange) For 32397995.
A component which converts a voltage from high to low, or in some cases low to high on a hybrid vehicle.

Source: https://usparts.volvocars.com/p/Volvo__EX90/Hybrid-Voltage-Converter/132452955/36010867.html




Source: https://ieeexplore.ieee.org/document/10215092

92. The ’884 Accused Products comprise a system comprising “a controller configured to: monitor a transfer of the charging energy supplied to the energy storage device; compare the monitored transfer of charging energy with a threshold comprising one of a voltage of the energy storage device and an average rectified line voltage of the charge bus; and after the threshold has been crossed, control the first bi-directional voltage modification assembly to modify one of a voltage and a current of the charging energy supplied to the first energy storage device.” For example, the ’884 Accused Products include a control module (i.e., a controller) which monitors the transfer of energy to the battery. For example, when the battery reaches full charge (i.e., the voltage of the battery reaches a threshold value indicating a full charge), the controller causes the bi-directional voltage modification assembly to modify the voltage and current supplied to the battery to zero to stop charging the battery and prevent overcharging the battery. For example,

during charging, the controller causes the bi-directional voltage modification assembly to modify the voltage of the charging energy by increasing the voltage incrementally as the battery's voltage reaches incremental thresholds (e.g., battery at 300V will be charged at 302V; battery at 302V will be charged at 304V, etc.).



**Control Module - Volvo (32436091)**

2025-2026 Volvo EX90 - 32436091

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 32436091 |
| **Brand:** | |
| **SKU:** | 32436091 |
| **Other Names:** | Drive Motor Battery Pack Control Module, Control Unit |
| **Description:** | High voltage battery. |

Source: https://volvo.oempartsonline.com/oem-parts/volvo-control-module-32436091

## Drive Motor Battery Pack Control Module

**Part Number: 32436091**

Control Unit. BECM, BDU and MSD. High Voltage Battery Module (HVBM).
A microprocessor controlled unit which manages the charging and use of the hybrid battery.

**Fits EX90 (2025 - 2025)**

Source: https://www.volvopartswebstore.com/products/volvo/EX90/Drive-Motor-Battery-Pack-Control-Module/17650541/32436091.html

You can set a target battery level by selecting a value in the charging view. This can help you to maintain good charging performance and battery longevity.

Source: 2025 Volvo EX90 User Manual, available at
https://www.volvocars.com/us/support/car/ex90/24w36/article/

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

93. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the ’884 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users, to directly infringe the ’884 Patent (e.g., by charging or otherwise using ’884 Accused Products).

94. At a minimum, Defendants have had knowledge of the ’884 Patent at least since service of this Complaint. Defendants also have had knowledge of the ’884 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’884 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents,

intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to use the ’884 Accused Products in an infringing manner, including by providing instructions on how to charge ’884 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions involving the ’884 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’884 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS “provides financial services products to Volvo consumers and Volvo retailers in the United States”); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the ’884 Patent.

95. On information and belief, despite having knowledge of the ’884 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the ’884 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing the ’884 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the ’884 Patent. On information and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm.

Further, on information and belief, Defendants' U.S.-based (and/or foreign-based) subsidiaries, affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the '884 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

96. BHT has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

97. Despite having knowledge of the '884 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the '884 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '884 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of BHT's rights with respect to the '884 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT II**

(INFRINGEMENT OF U.S. PATENT NO. 8,487,582)

98. BHT incorporates the preceding paragraphs herein by reference.

99. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

100. BHT is the owner of all substantial rights, title, and interest in and to the '582 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

101. The '582 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on July 16, 2013, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

102. Defendants directly infringe one or more claims of the '582 Patent in this District and elsewhere in Texas and the United States.

103. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 1 of the '582 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the '582 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems (collectively, "the '582 Accused Products").

104. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '582 Patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D.

Tex. May 3, 2019). Furthermore, Defendants directly infringed the '582 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '582 Patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries' infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

105. Defendants offer to sell Accused Products in the United States via at least Defendants' websites. Defendants' websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/ and https://www.polestar.com/us/. These platforms are part of Defendants' integrated U.S. sales channel for Defendants' benefit and under Defendants' direction or control.

106. By way of illustration only, Defendants' '582 Accused Products comprise each and every element of claim 1 of the '582 Patent. The '582 Accused Products comprise "[a]n apparatus

comprising: an energy storage device configured to output a DC voltage." For example, the '582 Accused Products are vehicles that include a high voltage battery (i.e., an energy storage device) which outputs DC voltage.

## 2025 Volvo EX90



Source: https://www.caranddriver.com/volvo/ex90-2025

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

### Battery

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/




Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833




Source: https://ieeexplore.ieee.org/document/10215092

107. The ’582 Accused Products comprise an apparatus comprising “a bi-directional voltage modification assembly coupled to the energy storage device.” For example, the ’582 Accused Products include a bi-directional converter (i.e., bi-directional voltage modification assembly) coupled to the high voltage battery (i.e., energy storage device).



## Hybrid Voltage Converter - Volvo (36010867)

2025-2026 Volvo EX90 - 36010867

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36010867 |

| | |
|---|---|
| **Brand:** | |
| **SKU:** | 36010867 |
| **Other Names:** | Voltage Reg, Voltage Converter, |
| **Description:** | Inverter & battery charger. |

Source: https://volvo.oempartsonline.com/oem-parts/volvo-hybrid-voltage-converter-36010867

## Hybrid Voltage Converter

Part Number: **36010867**

Converter and Charger. (hlcm).
(Exchange) For 32397995.
A component which converts a voltage from high to low, or in some cases low to high on a hybrid vehicle.

Source: https://usparts.volvocars.com/p/Volvo__EX90/Hybrid-Voltage-Converter/132452955/36010867.html




Source: https://ieeexplore.ieee.org/document/10215092

108. The '582 Accused Products comprise an apparatus comprising "a charge bus coupled to the energy storage device and to the bi-directional voltage modification assembly, the charge bus coupleable to a high-impedance voltage source." For example, the '582 Accused Products include a charge bus coupled to the high-voltage battery and the bi-directional voltage modification assembly. The voltage source is a standard 120-volt, 12-amp electrical outlet, while the high-voltage battery system uses 800 volts with lower amps. Accordingly, the voltage source is high-impedance.

Diagram 7: Wire Harness




Source: https://volvo.oempartsonline.com/v-2025-volvo-ex90--plus--electric/electrical--battery?assembly=7




Source: https://ieeexplore.ieee.org/document/10215092

## Charging Cable (23 Feet) 16 Amp

Part Number: **32257794**

The Volvo charging cable adds flexibility to your everyday life and comes with different connectors to suit your specific needs. Vehicle charging is monitored by two-way communication between the vehicle and the control box. When the cable is connected to the power source, self-test diagnostics are performed to ensure that the cable is properly connected and is ready to supply the vehicle with power. The control box is integrated into the charging cable and is plugged into an ordinary power socket. The cable is supplied with an adapter to enable Level 1 and Level 2 charging. Charging with Level 1. NEMA 5-15P. Charging with 120 V and 12 A. Charging with Level 2. NEMA 6-20P. Charging with 240 V and 16 A

Source: https://parts.portlandvolvo.com/p/Volvo__EX90/Charging-Cable-23-Feet-16-Amp/103836018/32257794.html

Powered by our new 800-volt electric system, the EX90 can charge even faster*, while the additional computing power allows us to deliver new or improved features over the air.

Source: https://www.volvocars.com/lb/news/articles/the-award-winning-ex90-just-levelled-up-with-faster-charging-and-new-advanced-features/

109. The ’582 Accused Products comprise an apparatus comprising “a controller configured to: monitor a transfer of charging energy supplied from the high-impedance voltage source to the energy storage device; and modify one of a voltage and a current of the charging energy supplied to the energy storage device based on the monitored transfer of charging energy.” For example, the ’582 Accused Products include a controller, which monitors the transfer of energy to the battery. When the battery reaches its charge limit, for example, the controller causes the bi-directional voltage modification assembly to modify the voltage and current supplied to the battery to zero to stop charging the battery. Additionally, during charging, for example, the controller causes the bi-directional voltage modification assembly to modify the voltage of the charging energy by increasing the voltage incrementally as the battery’s voltage reaches incremental thresholds (e.g., battery at 300V will be charged at 302V; battery at 302V will be charged at 304V, etc.).



## Control Module - Volvo (32436091)

2025-2026 Volvo EX90 - 32436091

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 32436091 |
| **Brand:** | |
| **SKU:** | 32436091 |
| **Other Names:** | Drive Motor Battery Pack Control Module, Control Unit |
| **Description:** | High voltage battery. |

Source: https://volvo.oempartsonline.com/oem-parts/volvo-control-module-32436091

## Drive Motor Battery Pack Control Module

**Part Number: 32436091**

Control Unit. BECM, BDU and MSD. High Voltage Battery Module (HVBM).
A microprocessor controlled unit which manages the charging and use of the hybrid battery.

**Fits EX90 (2025 - 2025)**

Source: https://www.volvopartswebstore.com/products/volvo/EX90/Drive-Motor-Battery-Pack-Control-Module/17650541/32436091.html

You can set a target battery level by selecting a value in the charging view. This can help you to maintain good charging performance and battery longevity.

A smart schedule decides when to charge based on different parameters, for example battery health, cheapest time and user preferences.[1]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/

charging performance is further improved by our in-house developed battery management software. Using a smart algorithm, it works in tandem with the 800V system to optimise charging, making it significantly faster than previously possible and adding up to 250 km of range in just 10 minutes.

Source: https://www.volvocars.com/intl/news/articles/the-award-winning-ex90-just-levelled-up-with-faster-charging-and-new-advanced-features/

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

110. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the '582 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users, to directly infringe the '582 Patent (e.g., by charging or otherwise using '582 Accused Products).

111. At a minimum, Defendants have had knowledge of the '582 Patent at least since service of this Complaint. Defendants also have had knowledge of the '582 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '582 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via

https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to use the '582 Accused Products in an infringing manner, including by providing instructions on how to charge '582 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions involving the '582 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the '582 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS "provides financial services products to Volvo consumers and Volvo retailers in the United States"); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the '582 Patent.

112. On information and belief, despite having knowledge of the '582 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the '582 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing the '582 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the '582 Patent. On information

and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm. Further, on information and belief, Defendants' U.S.-based (and/or foreign-based) subsidiaries, affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the '582 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

113. BHT has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

114. Despite having knowledge of the '582 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the '582 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '582 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of BHT's rights with respect to the '582 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT III**

(INFRINGEMENT OF U.S. PATENT NO. 9,809,121)

115. BHT incorporates the preceding paragraphs herein by reference.

116. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

117. BHT is the owner of all substantial rights, title, and interest in and to the ’121 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

118. The ’121 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on November 7, 2017, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

119. Defendants directly infringe one or more claims of the ’121 Patent in this District and elsewhere in Texas and the United States.

120. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 7 of the ’121 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the ’121 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems (collectively, “the ’121 Accused Products”).

121. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those

products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '121 Patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019). Furthermore, Defendants directly infringed the '121 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '121 Patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries' infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

122. Defendants offer to sell Accused Products in the United States via at least Defendants' websites. Defendants' websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/

and https://www.polestar.com/us/. These platforms are part of Defendants' integrated U.S. sales channel for Defendants' benefit and under Defendants' direction or control.

123. By way of illustration only, Defendants' '121 Accused Products comprise each and every element of claim 7 of the '121 Patent. The '121 Accused Products comprise "[a] vehicle comprising: an energy storage device." For example, the '121 Accused Products are vehicles that include a high voltage battery (i.e., an energy storage device).

**2025 Volvo EX90**



Source: https://www.caranddriver.com/volvo/ex90-2025

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

## Battery

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/



PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

Drive Motor Battery Pack - Volvo (36011833)

We sell only 100% Genuine Volvo Replacement Parts

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36011833 |

Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833

124. The ’121 Accused Products comprise a vehicle comprising “a connection system coupleable to an external charging source and configured to utilize a first connection and a second connection.” For example, the ’121 Accused Products include a connection system coupleable to an external charging source and configured to use a first connection (e.g., a DC charging input) and a second connection (e.g., an AC charging input).



Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/

### AC charging at a charging station or from a charging point at home

AC charging points are available at a variety of charging locations, both public and private. An AC charging point can be installed at home and is the recommended source for regular charging.

### DC fast charging

DC fast charging is available at certain charging stations. These charging stations deliver very high power that allows for shorter charging times.

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/




PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

## Drive Motor Battery Pack Charging Port Assembly - Volvo (32416651)

2025 Volvo EX90

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 32416651 |

Source: https://www.volvopartscounter.com/oem-parts/volvo-charging-port-32416651




Source: https://ieeexplore.ieee.org/document/10215092

125. The '121 Accused Products comprise a vehicle comprising "connection system configured to: provide an input voltage to charge the energy storage device at a first charging rate when the energy storage device is coupled to the first connection; and provide an input voltage to charge the energy storage device at a second charging rate when the energy storage device is coupled to the second connection." For example, the '121 Accused Products utilize an AC or DC charging subsystem couplable to the high voltage battery each of which has its own input voltage and charging rate to charge the high voltage battery.

| CHARGING | |
|---|---|
| AC, h (3-PHASE) (16 A / 10 A / 6 A) | 10 / 16 / 28 |
| AC, h (1-PHASE) (48 A / 32 A / 16 A / 10 A) | 10 / 15 / 29 / 45 |
| DC, min (50 KW) ** | 92 |
| DC, min (150 KW) ** | 35 |
| DC, min (200 KW) ** | 32 |
| DC, min (250 KW) ** | 30 |

** (10-80% loading rate, battery temp 20-35 deg C)

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

126. The '121 Accused Products comprise a vehicle comprising "a plurality of DC converters coupleable to the connection system, the plurality of DC converters configured to: boost the input voltage to an intermediate voltage via a first DC converter; and buck the intermediate voltage to an output voltage via a second DC converter, the output voltage for charging the energy storage device." For example, the '121 Accused Products utilize a plurality of DC converters coupleable to the connection system, including a boost DC converter in the AC Charging Subsystem to boost/increase the second input voltage to a higher intermediate voltage and a buck DC converter to buck/decrease the intermediate voltage for charging the high voltage battery.




Source: https://ieeexplore.ieee.org/document/10215092

## Architecture of an Onboard Charger

An onboard charger is comprised of several stages to convert the AC power to DC power.

The first stage is the one-phase to three-phase power factor correction (PFC) stage, which converts the AC voltage from the grid into an intermediate DC voltage between 400V and 800V, depending on the vehicle battery's voltage (note that battery voltages have been increasing to allow for higher efficiency, faster charging times, and lighter cabling within a vehicle). Though the PFC architecture can range from one phase to three phases, three phases has become more popular as power levels increase.

The second stage is the isolated DC/DC stage that converts the intermediate DC voltage to the target voltage. The target voltage is specific to the battery being charged, and it can vary between 200V and 800V, depending on whether a PHEV or BEV is being charged. For the DC/DC stage, it is common to use LLC and phase-shift, full-bridge converter topologies.

Source: https://www.monolithicpower.com/learning/resources/designing-onboard-chargers-for-high-performance-and-power-density

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

127. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the ’121 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships,

customers, and/or other end users, to directly infringe the ’121 Patent (e.g., by charging or otherwise using ’121 Accused Products).

128. At a minimum, Defendants have had knowledge of the ’121 Patent at least since service of this Complaint. Defendants also have had knowledge of the ’121 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’121 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to use the ’121 Accused Products in an infringing manner, including by providing instructions on how to charge ’121 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions

involving the ’121 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’121 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS “provides financial services products to Volvo consumers and Volvo retailers in the United States”); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the ’121 Patent.

129. On information and belief, despite having knowledge of the ’121 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the ’121 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing the ’121 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the ’121 Patent. On information and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm. Further, on information and belief, Defendants’ U.S.-based (and/or foreign-based) subsidiaries, affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the ’121 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for

sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

130. BHT has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

131. Despite having knowledge of the '121 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the '121 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '121 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of BHT's rights with respect to the '121 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT IV**

(INFRINGEMENT OF U.S. PATENT NO. 9,914,365)

132. BHT incorporates the preceding paragraphs herein by reference.

133. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

134. BHT is the owner of all substantial rights, title, and interest in and to the '365 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

135. The '365 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on March 13, 2018, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

136. Defendants directly infringe one or more claims of the ’365 Patent in this District and elsewhere in Texas and the United States.

137. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 1 of the ’365 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the ’365 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems with DC fast charging capabilities (collectively, “the ’365 Accused Products”).

138. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the ’365 Patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019). Furthermore, Defendants directly infringed the ’365 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the ’365 Patent under 35 U.S.C. § 271(a) by having made, used,

tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries' infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

139. Defendants offer to sell Accused Products in the United States via at least Defendants' websites. Defendants' websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/ and https://www.polestar.com/us/. These platforms are part of Defendants' integrated U.S. sales channel for Defendants' benefit and under Defendants' direction or control.

140. By way of illustration only, Defendants' '365 Accused Products comprise each and every element of claim 1 of the '365 Patent. The '365 Accused Products comprise "[a] vehicle charging system comprising: an energy storage device." For example, the '365 Accused Products have a vehicle charging system that includes a high voltage battery (i.e., an energy storage device).

# 2025 Volvo EX90



Source: https://www.caranddriver.com/volvo/ex90-2025

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

## Battery

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/



PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

Drive Motor Battery Pack - Volvo (36011833)

We sell only 100% Genuine Volvo Replacement Parts

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36011833

Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833

141. The ’365 Accused Products comprise a vehicle charging system comprising “a connection system coupleable to an external charging source and configured to utilize a DC connection and an AC connection, the connection system configured to: provide a first input voltage to charge the energy storage device at a first charging rate when the energy storage device is coupled to the DC connection; and provide a second input voltage to charge the energy storage device at a second charging rate when the energy storage device is coupled to the AC connection.” For example, the ’365 Accused Products includes a connection system coupleable to an external charging source and configured to use a DC charging input (i.e., a DC connection) and an AC charging input (i.e., an AC connection). The connection system is configured to provide an input voltage to charge the high voltage battery at a first charging rate when the DC charging input is coupled to the high voltage battery and provides an input voltage to charge the high voltage battery at a second charging rate when the AC charging input is coupled to the high voltage battery.



Source: 2025 Volvo EX90 User Manual, available at
https://www.volvocars.com/us/support/car/ex90/24w36/article/

### AC charging at a charging station or from a charging point at home

AC charging points are available at a variety of charging locations, both public and private. An AC charging point can be installed at home and is the recommended source for regular charging.

### DC fast charging

DC fast charging is available at certain charging stations. These charging stations deliver very high power that allows for shorter charging times.

Source: 2025 Volvo EX90 User Manual, available at
https://www.volvocars.com/us/support/car/ex90/24w36/article/




PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

## Drive Motor Battery Pack Charging Port Assembly - Volvo (32416651)

2025 Volvo EX90

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 32416651 |

Source: https://www.volvopartscounter.com/oem-parts/volvo-charging-port-32416651

| CHARGING | |
|---|---|
| AC, h (3-PHASE) (16 A / 10 A / 6 A) | 10 / 16 / 28 |
| AC, h (1-PHASE) (48 A / 32 A / 16 A / 10 A) | 10 / 15 / 29 / 45 |
| DC, min (50 KW) ** | 92 |
| DC, min (150 KW) ** | 35 |
| DC, min (200 KW) ** | 32 |
| DC, min (250 KW) ** | 30 |

** (10-80% loading rate, battery temp 20-35 deg C)

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/




Source: https://ieeexplore.ieee.org/document/10215092

142. The '365 Accused Products comprise a vehicle charging system comprising "an AC/DC converter coupleable to the AC connection." For example, the '365 Accused Products include a battery charger with an inverter (e.g., AC/DC converter) coupleable to the AC connection.




PART CAN BE FOUND AS REFERENCE #6 IN ILLUSTRATION

## Battery Charger Ob - Volvo (36012239)

2025 Volvo EX90

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36012239 |
| Replaces: | 36011005, 36012267, 36013238 |

| | |
|---|---|
| **Brand:** | |
| **SKU:** | 36012239 |
| **Description:** | Inverter & battery charger. |
| **Replaces:** | 36011005, 36012267, 36013238 |

Source: https://www.volvopartscounter.com/oem-parts/volvo-battery-charger-ob-36012239

### Architecture of an Onboard Charger

An onboard charger is comprised of several stages to convert the AC power to DC power.

The first stage is the one-phase to three-phase power factor correction (PFC) stage, which converts the AC voltage from the grid into an intermediate DC voltage between 400V and 800V, depending on the vehicle battery's voltage (note that battery voltages have been increasing to allow for higher efficiency, faster charging times, and lighter cabling within a vehicle). Though the PFC architecture can range from one phase to three phases, three phases has become more popular as power levels increase.

The second stage is the isolated DC/DC stage that converts the intermediate DC voltage to the target voltage. The target voltage is specific to the battery being charged, and it can vary between 200V and 800V, depending on whether a PHEV or BEV is being charged. For the DC/DC stage, it is common to use LLC and phase-shift, full-bridge converter topologies.

Source: https://www.monolithicpower.com/learning/resources/designing-onboard-chargers-for-high-performance-and-power-density




Source: https://ieeexplore.ieee.org/document/10215092

143. The '365 Accused Products comprise a vehicle charging system comprising "a plurality of DC converters coupleable to the AC/DC converter and the DC connection, the plurality of DC converters configured to: boost the first or second input voltage to an intermediate voltage via a first DC converter; and buck the intermediate voltage to an output voltage via a second DC converter, the output voltage for charging the energy storage device." For example, the '365 Accused Products utilize a plurality of DC converters coupleable to the AC/DC converter and the DC connection via the high voltage DC bus. These DC converters include a boost DC converter in the AC Charging Subsystem to boost/increase the second input voltage to a higher intermediate voltage and a buck DC converter to buck/decrease the intermediate voltage for charging the high-voltage battery.




Source: https://ieeexplore.ieee.org/document/10215092

## Architecture of an Onboard Charger

An onboard charger is comprised of several stages to convert the AC power to DC power.

The first stage is the one-phase to three-phase power factor correction (PFC) stage, which converts the AC voltage from the grid into an intermediate DC voltage between 400V and 800V, depending on the vehicle battery's voltage (note that battery voltages have been increasing to allow for higher efficiency, faster charging times, and lighter cabling within a vehicle). Though the PFC architecture can range from one phase to three phases, three phases has become more popular as power levels increase.

The second stage is the isolated DC/DC stage that converts the intermediate DC voltage to the target voltage. The target voltage is specific to the battery being charged, and it can vary between 200V and 800V, depending on whether a PHEV or BEV is being charged. For the DC/DC stage, it is common to use LLC and phase-shift, full-bridge converter topologies.

Source: https://www.monolithicpower.com/learning/resources/designing-onboard-chargers-for-high-performance-and-power-density

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

144. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the '365 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships,

customers, and/or other end users, to directly infringe the ’365 Patent (e.g., by charging or otherwise using ’365 Accused Products).

145. At a minimum, Defendants have had knowledge of the ’365 Patent at least since service of this Complaint. Defendants also have had knowledge of the ’365 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’365 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to use the ’365 Accused Products in an infringing manner, including by providing instructions on how to charge ’365 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions

involving the ’365 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’365 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS "provides financial services products to Volvo consumers and Volvo retailers in the United States"); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the ’365 Patent.

146. On information and belief, despite having knowledge of the ’365 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the ’365 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing the ’365 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the ’365 Patent. On information and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm. Further, on information and belief, Defendants' U.S.-based (and/or foreign-based) subsidiaries, affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the ’365 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for

sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

147. BHT has been damaged as a result of Defendants' infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

148. Despite having knowledge of the '365 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the '365 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants' infringing activities relative to the '365 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of BHT's rights with respect to the '365 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT V**

(INFRINGEMENT OF U.S. PATENT NO. 9,975,439)

149. BHT incorporates the preceding paragraphs herein by reference.

150. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

151. BHT is the owner of all substantial rights, title, and interest in and to the '439 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

152. The '439 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 22, 2018, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

153. Defendants directly infringe one or more claims of the ’439 Patent in this District and elsewhere in Texas and the United States.

154. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 1 of the ’439 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the ’439 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems (collectively, “the ’439 Accused Products”).

155. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the ’439 Patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019). Furthermore, Defendants directly infringed the ’439 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the ’439 Patent under 35 U.S.C. § 271(a) by having made, used,

tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries' infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

156. Defendants offer to sell Accused Products in the United States via at least Defendants' websites. Defendants' websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/ and https://www.polestar.com/us/. These platforms are part of Defendants' integrated U.S. sales channel for Defendants' benefit and under Defendants' direction or control.

157. By way of illustration only, Defendants' '439 Accused Products comprise each and every element of claim 1 of the '439 Patent. The '439 Accused Products comprise "[a] vehicle comprising: an energy storage device." For example, the '439 Accused Products are vehicles that include a high voltage battery (i.e., an energy storage device).

# 2025 Volvo EX90



Source: https://www.caranddriver.com/volvo/ex90-2025

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

## Battery

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/



PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

Drive Motor Battery Pack - Volvo (36011833)

We sell only 100% Genuine Volvo Replacement Parts

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36011833

Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833

158. The ’439 Accused Products comprise a vehicle comprising “a first voltage converter coupleable to the energy storage device.” For example, the ’439 Accused Products include a voltage converter coupleable to the high voltage battery.



Hybrid Voltage Converter - Volvo (36010867)

2025-2026 Volvo EX90 - 36010867

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36010867

**Brand:**

**SKU:** 36010867

**Other Names:** Voltage Reg, Voltage Converter,

**Description:** Inverter & battery charger.

Source: https://volvo.oempartsonline.com/oem-parts/volvo-hybrid-voltage-converter-36010867

Hybrid Voltage Converter

Part Number: 36010867

Converter and Charger. (hlcm).
(Exchange) For 32397995.
A component which converts a voltage from high to low, or in some cases low to high on a hybrid vehicle.

Source: https://usparts.volvocars.com/p/Volvo__EX90/Hybrid-Voltage-Converter/132452955/36010867.html

159. The ’439 Accused Products comprise a vehicle comprising “a traction drive coupleable to the first voltage converter, the traction drive comprising an inverter coupled to a traction motor.” For example, the ’439 Accused Products include a drive motor (i.e., traction drive) coupleable to the first voltage converter, the drive motor (i.e., traction drive) comprising a control module/electric motor module (i.e., inverter) coupled to a drive motor (i.e., traction motor).



**Control Module** - Volvo (32412612)

2025-2026 Volvo EX90

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 32412612

**Brand:**

**SKU:** 32412612

**Positions:** Front

**Other Names:** Engine Control Module (ECM), Control Unit

**Description:** Electric motor module, front.

Source: https://www.volvopartscounter.com/oem-parts/volvo-control-module-32412612



PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

**Drive Motor** - Volvo (36013378)

2025 Volvo EX90

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36013378

**Brand:**

Source: https://www.volvopartscounter.com/oem-parts/volvo-drive-motor-36013378

160. The ’439 Accused Products comprise a vehicle comprising “a charging system on-board the vehicle and coupleable to the energy storage device.” For example, the ’439 Accused Products utilize an AC charging system that is on-board and coupleable to the high voltage battery.




PART CAN BE FOUND AS REFERENCE #6 IN ILLUSTRATION

**Battery Charger Ob - Volvo (36012239)**

2025 Volvo EX90

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36012239 |
| Replaces: | 36011005, 36012267, 36013238 |

Source: https://www.volvopartscounter.com/oem-parts/volvo-battery-charger-ob-36012239

161. The ’439 Accused Products comprise a vehicle comprising a charging system comprising “a receptacle coupleable to an external charging source; a second voltage converter configured to boost an input voltage derived from the external charging source to an intermediate voltage; and a third voltage converter configured to buck the intermediate voltage to an output voltage to charge the energy storage device.” For example, the charging system of the ’439 Accused Products has a receptacle coupleable to an external charging source, a second voltage converter in the AC Charging Subsystem to boost an input voltage, and a third voltage converter in the AC Charging Subsystem to buck the voltage for charging the high voltage battery.



Source: 2025 Volvo EX90 User Manual, available at https://www.volvocars.com/us/support/car/ex90/24w36/article/




PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

## Drive Motor Battery Pack Charging Port Assembly - Volvo (32416651)

2025 Volvo EX90

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 32416651

Source: https://www.volvopartscounter.com/oem-parts/volvo-drive-motor-battery-pack-charging-port-assembly-32416651

### Architecture of an Onboard Charger

An onboard charger is comprised of several stages to convert the AC power to DC power.

The first stage is the one-phase to three-phase power factor correction (PFC) stage, which converts the AC voltage from the grid into an intermediate DC voltage between 400V and 800V, depending on the vehicle battery's voltage (note that battery voltages have been increasing to allow for higher efficiency, faster charging times, and lighter cabling within a vehicle). Though the PFC architecture can range from one phase to three phases, three phases has become more popular as power levels increase.

The second stage is the isolated DC/DC stage that converts the intermediate DC voltage to the target voltage. The target voltage is specific to the battery being charged, and it can vary between 200V and 800V, depending on whether a PHEV or BEV is being charged. For the DC/DC stage, it is common to use LLC and phase-shift, full-bridge converter topologies.

Source: https://www.monolithicpower.com/learning/resources/designing-onboard-chargers-for-high-performance-and-power-density

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

162. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the '439 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users, to directly infringe the '439 Patent (e.g., by charging or otherwise using '439 Accused Products).

163. At a minimum, Defendants have had knowledge of the '439 Patent at least since service of this Complaint. Defendants also have had knowledge of the '439 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '439 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to

use the ’439 Accused Products in an infringing manner, including by providing instructions on how to charge ’439 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions involving the ’439 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’439 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS "provides financial services products to Volvo consumers and Volvo retailers in the United States"); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the ’439 Patent.

164. On information and belief, despite having knowledge of the ’439 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the ’439 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing the ’439 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the ’439 Patent. On information and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm. Further, on information and belief, Defendants' U.S.-based (and/or foreign-based) subsidiaries,

affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the ’439 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

165. BHT has been damaged as a result of Defendants’ infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants’ infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

166. Despite having knowledge of the ’439 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the ’439 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants’ infringing activities relative to the ’439 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of BHT’s rights with respect to the ’439 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT VI**

(INFRINGEMENT OF U.S. PATENT NO 10,604,023)

167. BHT incorporates the preceding paragraphs herein by reference.

168. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

169. BHT is the owner of all substantial rights, title, and interest in and to the ’023 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

170. The ’023 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on March 31, 2020, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

171. Defendants directly infringe one or more claims of the ’023 Patent in this District and elsewhere in Texas and the United States.

172. Defendants directly infringe, either by themselves individually or via their agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 1 of the ’023 Patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Volvo-branded and Polestar-branded electric vehicles that incorporate the fundamental technologies covered by the ’023 Patent, including, but not limited to, Volvo-branded and Polestar-branded vehicles (e.g., the 2025 Volvo EX90) equipped with electric and/or hybrid-electric powertrain systems (collectively, “the ’023 Accused Products”).

173. On information and belief, Defendants sold and made some Accused Products outside of the United States, delivered those products to their customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that they delivered the Accused Products outside of the United States they did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the ’023 Patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D.

Tex. May 3, 2019). Furthermore, Defendants directly infringed the ’023 Patent through their direct involvement in the activities of their subsidiaries, including VCUSA, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the ’023 Patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Products. On information and belief, Defendants offered for sale, sold, and imported the Accused Products within the U.S. to, for example, their distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendants are vicariously liable for this infringing conduct of their U.S.-based subsidiaries, e.g., VCUSA, (under both the alter ego and agency theories) because, as an example and on information and belief, VCC and its subsidiaries are essentially the same company, Polestar and its subsidiaries are essentially the same company, and Defendants have the right and ability to control their subsidiaries’ infringing acts and receive a direct financial benefit from the infringement of their U.S.-based subsidiaries.

174. Defendants offer to sell Accused Products in the United States via at least Defendants’ websites. Defendants’ websites market Accused Products to U.S. consumers, identify current offers and incentives, provide build-and-price functionality, direct consumers to nearby authorized dealer inventory, and enable consumers to request dealer pricing or otherwise proceed towards purchasing or leasing Accused Products. *See generally* https://www.volvocars.com/us/ and https://www.polestar.com/us/. These platforms are part of Defendants’ integrated U.S. sales channel for Defendants’ benefit and under Defendants’ direction or control.

175. By way of illustration only, Defendants’ ’023 Accused Products comprise each and every element of claim 1 of the ’023 Patent. The ’023 Accused Products comprise “[a] vehicle

comprising: an energy storage device." For example, the '023 Accused Products are vehicles that include a high voltage battery (i.e., an energy storage device).

**2025 Volvo EX90**



Source: https://www.caranddriver.com/volvo/ex90-2025

| BATTERY | |
|---|---|
| Battery content, total amount of energy, (kWh) (Nominal) | 111 |
| Battery content, total amount of energy, (kWh) (Usable) | 107 |
| DC Charging Power (kW) (Peak Power) | 250 |

Source: https://www.volvocars.com/us/media/documents/0fa238764cad45829247b33e001cfd98/

**Battery**

Battery TYPE: CP1254 A4 WC

Manufacturer

- Manufacturer Name: VARTA Microbattery GmbH
- Trade Name: VARTA
- Address: VARTA-Platz 1, 73479 Elwangen, Germany
- URL: https://www.varta-microbattery.com/en [https://www.varta-microbattery.com/en]

Source: 2025 Volvo EX90 User Manual, available at
https://www.volvocars.com/us/support/car/ex90/24w36/article/




Drive Motor Battery Pack - Volvo (36011833)

We sell only 100% Genuine Volvo Replacement Parts

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36011833

Source: https://www.volvodealerparts.com/oem-parts/volvo-drive-motor-battery-pack-36011833

176. The '023 Accused Products comprise a vehicle comprising "a first voltage converter coupleable to the energy storage device via a first switching device." For example, the '023 Accused Products include a voltage converter coupleable to the high voltage battery via a contactor (i.e., a first switching device) for a positive terminal of the high voltage battery.



Hybrid Voltage Converter - Volvo (36010867)

2025-2026 Volvo EX90 - 36010867

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 36010867

**Brand:**

**SKU:** 36010867

**Other Names:** Voltage Reg, Voltage Converter,

**Description:** Inverter & battery charger.

Source: https://volvo.oempartsonline.com/oem-parts/volvo-hybrid-voltage-converter-36010867

**Hybrid Voltage Converter**
Part Number: **36010867**

Converter and Charger. (hlcm).
(Exchange) For 32397995.
A component which converts a voltage from high to low, or in some cases low to high on a hybrid vehicle.

Source: https://usparts.volvocars.com/p/Volvo__EX90/Hybrid-Voltage-Converter/132452955/36010867.html

**Drive Motor Battery Pack Control Module Connector**
Part Number: **32263836**

Contactor. BECM, BDU and MSD.
A component which is used to attach the vehicle wiring harness to the Hybrid High Voltage Battery Control Module.

**Fits EX90**

Source: https://parts.volvocarsofmarietta.com/p/Volvo_2025_EX90/Drive-Motor-Battery-Pack-Control-Module-Connector/120369934/32263836.html

**Drive Motor Battery Pack Control Module Connector**
Part Number: **32263835**

Contactor. BECM, BDU and MSD. High Voltage Battery and Installation Components.
A component which is used to attach the vehicle wiring harness to the Hybrid High Voltage Battery Control Module.

**Fits EX90**

Source: https://parts.volvocarsofmarietta.com/p/120371451/32263835.html

177. The ’023 Accused Products comprise a vehicle comprising “a traction drive coupled to the first voltage converter, the traction drive comprising an inverter coupled to a traction motor.” For example, the ’023 Accused Products include a drive motor (i.e., traction drive) coupled to the first voltage converter, the drive motor (i.e., traction drive) comprising a control module/electric motor module (i.e., inverter) coupled to a drive motor (i.e., traction drive).




Source: https://www.volvopartscounter.com/oem-parts/volvo-control-module-32412612




Source: https://www.volvopartscounter.com/oem-parts/volvo-drive-motor-36013378

178. The ’023 Accused Products comprise a vehicle comprising “a charging system on-board the vehicle and coupleable to the energy storage device via a second switching device.” For example, the ’023 Accused Products utilize an AC charging system that is on-board and coupleable to the high voltage battery via a second contactor (i.e., a second switching device) for a negative terminal of the high voltage battery which connects or disconnects the charging system.



PART CAN BE FOUND AS REFERENCE #6 IN ILLUSTRATION

**Battery Charger Ob - Volvo (36012239)**

2025 Volvo EX90

**Genuine Volvo Parts**

| | |
|---|---|
| Manufacturer: | Volvo |
| Part Number: | 36012239 |
| Replaces: | 36011005, 36012267, 36013238 |

Source: https://www.volvopartscounter.com/oem-parts/volvo-battery-charger-ob-36012239

**Drive Motor Battery Pack Control Module Connector**

Part Number: **32263836**

Contactor. BECM, BDU and MSD.
A component which is used to attach the vehicle wiring harness to the Hybrid High Voltage Battery Control Module.

**Fits EX90**

Source: https://parts.volvocarsofmarietta.com/p/Volvo_2025_EX90/Drive-Motor-Battery-Pack-Control-Module-Connector/120369934/32263836.html

**Drive Motor Battery Pack Control Module Connector**

Part Number: **32263835**

Contactor. BECM, BDU and MSD. High Voltage Battery and Installation Components.
A component which is used to attach the vehicle wiring harness to the Hybrid High Voltage Battery Control Module.

**Fits EX90**

Source: https://parts.volvocarsofmarietta.com/p/120371451/32263835.html

179. The ’023 Accused Products comprise a vehicle comprising a charging system comprising “a receptacle configured to mate with an external charging source; a second voltage converter configured to boost an input voltage derived from the external charging source to an intermediate voltage; and a third voltage converter configured to buck the intermediate voltage to an output voltage to charge the energy storage device.” For example, the charging system of the

’023 Accused Products has a receptacle configured to mate with an external charging source, a second voltage converter in the AC Charging Subsystem to boost an input voltage, and a third voltage converter in the AC Charging Subsystem to buck the voltage for charging the high voltage battery.



Source: 2025 Volvo EX90 User Manual, available at
https://www.volvocars.com/us/support/car/ex90/24w36/article/




PART CAN BE FOUND AS REFERENCE #1 IN ILLUSTRATION

**Drive Motor Battery Pack Charging Port Assembly - Volvo (32416651)**

2025 Volvo EX90

**Genuine Volvo Parts**

Manufacturer: Volvo

Part Number: 32416651

Source: https://www.volvopartscounter.com/oem-parts/volvo-drive-motor-battery-pack-charging-port-assembly-32416651

**Architecture of an Onboard Charger**

An onboard charger is comprised of several stages to convert the AC power to DC power.

The first stage is the one-phase to three-phase power factor correction (PFC) stage, which converts the AC voltage from the grid into an intermediate DC voltage between 400V and 800V, depending on the vehicle battery's voltage (note that battery voltages have been increasing to allow for higher efficiency, faster charging times, and lighter cabling within a vehicle). Though the PFC architecture can range from one phase to three phases, three phases has become more popular as power levels increase.

The second stage is the isolated DC/DC stage that converts the intermediate DC voltage to the target voltage. The target voltage is specific to the battery being charged, and it can vary between 200V and 800V, depending on whether a PHEV or BEV is being charged. For the DC/DC stage, it is common to use LLC and phase-shift, full-bridge converter topologies.

Source: https://www.monolithicpower.com/learning/resources/designing-onboard-chargers-for-high-performance-and-power-density

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

180. In addition and/or in the alternative to the direct infringements, Defendants indirectly infringe one or more claims of the '023 Patent by knowingly and intentionally inducing others, including their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users, to directly infringe the '023 Patent (e.g., by charging or otherwise using '023 Accused Products).

181. At a minimum, Defendants have had knowledge of the '023 Patent at least since service of this Complaint. Defendants also have had knowledge of the '023 Patent since receiving detailed correspondence from BHT prior to the filing of the Complaint, alerting Defendants to their infringements. Since receiving notice of their infringements, Defendants have actively induced, and continue to actively induce, the direct infringements of their agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and/or other end users (e.g., as illustrated above) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '023 Patent. Indeed, Defendants have intended to cause, continue to intend to cause, and have taken, and continue to take, affirmative steps to induce infringement by, among other things, instructing, directing, authorizing, approving, creating, and/or disseminating

advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals (e.g., those available via https://www.volvocars.com/us/support/ and https://www.polestar.com/us/manual/), and online instructional materials (e.g., those available via https://www.youtube.com/@VolvoCars and https://www.youtube.com/polestarcars) that specifically teach and encourage agents, intermediaries, distributors, importers, subsidiaries, dealerships, customers, and other end users to use the ’023 Accused Products in an infringing manner, including by providing instructions on how to charge ’023 Accused Products. Affirmative steps to induce infringement further include providing captive financing, leasing, customer financing, account servicing, retailer support, and related financial services that specifically facilitate, enable, and encourage vehicle transactions involving the ’023 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’023 Accused Products. *See, e.g.*, https://www.volvocars.com/us/media/press-releases/6B7E00F24A778995/ (VCFS “provides financial services products to Volvo consumers and Volvo retailers in the United States”); https://www.polestarfinancialservices.com/about/company-overview. By providing such directives, authorization, approval, instructions, financing, and support, Defendants know (and have known), or should know (and should have known), that their actions have actively induced, and continue to actively induce, infringement of the ’023 Patent.

182. On information and belief, despite having knowledge of the ’023 Patent and their infringement, Defendants specifically intended for others to import and sell products accused of infringing the ’023 Patent. For example, Defendants specifically intended for their U.S.-based (and/or foreign-based) subsidiaries or customers to import and sell products accused of infringing

the ’023 Patent. On information and belief, Defendants instructed and encouraged the importers or customers to import and/or sell products accused of infringing the ’023 Patent. On information and belief, the purchase and sale agreements between Defendants and the subsidiaries, importers, or customers provide such instruction and/or encouragement. *See, e.g.*, https://www.sec.gov/Archives/edgar/data/1884082/000119312522185122/d305041dex491.htm. Further, on information and belief, Defendants’ U.S.-based (and/or foreign-based) subsidiaries, affiliates, employees, agents, and/or related companies existed for, inter alia, the purpose of importing and selling products accused of infringing the ’023 Patent in the United States. In another example, Defendants actively induced agents, intermediaries, distributors, importers, subsidiaries, customers, and/or other end users that have purchased, imported, used, offered for sale, and/or sold Accused Products in the U.S. by marking the Accused Products with vehicle labels indicating compliance with U.S. laws and regulations for the Accused Products destined and intended to be sold in the U.S. *See, e.g., supra* ¶ 6.

***Damages***

183. BHT has been damaged as a result of Defendants’ infringing conduct described in this Count. Defendants are, thus, liable to BHT in an amount that adequately compensates BHT for Defendants’ infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

184. Despite having knowledge of the ’023 Patent and knowledge that they directly and/or indirectly infringe one or more claims of the ’023 Patent, Defendants have nevertheless continued their infringing conduct and disregarded an objectively high likelihood of infringement. Defendants’ infringing activities relative to the ’023 Patent have, thus, been, and continue to be,

willful, wanton, and deliberate in disregard of BHT's rights with respect to the '023 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

185. BHT is entitled to recover from Defendants the damages sustained by BHT as a result of Defendants' wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

186. BHT has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, BHT is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

187. BHT hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

188. BHT respectfully requests that the Court find in its favor and against Defendants, and that the Court grant BHT the following relief:

(i) Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Defendants;

(ii) Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by Defendants;

(iii) Judgment that Defendants account for and pay to BHT all damages and costs incurred by BHT because of Defendants' infringements and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iv) Judgment that Defendants account for and pay to BHT a reasonable, ongoing, post-judgment royalty because of Defendants' infringements, including continuing infringing activities, and other conduct complained of herein;

(v) Judgment that BHT be granted pre-judgment and post-judgment interest on the damages caused by Defendants' infringements and other conduct complained of herein;

(vi) Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(vii) Such other and further relief as the Court deems just and equitable.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Patrick J. Conroy*
**Patrick J. Conroy**
Texas Bar No. 24012448
**Ryan P. Griffin**
Texas Bar No. 24053687
**T. William Kennedy Jr.**
Texas Bar No. 24055771
**Jonathan H. Rastegar**
Texas Bar No. 24064043
**Nathan L. Levenson**
Texas Bar No. 24097992
**Brandon G. Moore**
Texas Bar No. 24082372
**NELSON BUMGARDNER CONROY PC**
2727 N. Harwood St., Suite 250
Dallas, TX 75201
pat@nelbum.com
ryan@nelbum.com
bill@nelbum.com
jon@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

**Attorneys for Plaintiff Bunker Hill Technologies, LLC**